IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DM TRANS, LLC d/b/a ARRIVE
LOGISTICS,

                  Plaintiff,

      v.

LINDSEY B. SCOTT; MATTHEW J.
DUFFY; SCOTT C. MAYER; FRANK
J. HERNANDEZ; BRYAN C.
KLEPPERICH; JAKE HOFFMAN; and
TRAFFIC TECH, INC.,

              Defendants.

Case No. 21 C 3634

Judge Harry D. Leinenwebe

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff DM Trans, LLC's Motion for a Preliminary Injunction (Dkt. No. 56). For the reasons set forth herein, the Court denies the Motion.

## I. BACKGROUND

Plaintiff DM Trans, LLC, which does business as Arrive Logistics ("Arrive"), is a third-party logistics ("3PL") company founded in 2014. (Sec. Am. Compl. ¶ 20, Dkt. No. 45.) This is a highly competitive industry with "hundreds of 3PLs in the Chicago area." (9/23/2021 Tr. 27:13–16, Dkt. No. 70.) While some larger companies may have an exclusive relationship with a single logistics provider, many customers will "e-mail multiple 3PLs in

one email" to request a bid for the transfer of specific freight to a specific location. (*Id.* 27:4-5.) As it happens, after receiving one of these emails from a customer, Arrive noticed that former employee Defendant Lindsey Scott was being asked to provide a bid as a sales representative of competitor Traffic Tech, Co-Defendant in this case, despite servicing that customer for Arrive only months earlier. (*Id.* 27:5-7.) Suspecting foul play, Arrive brought its concerns to federal court.

In order to compete in the logistics industry, Arrive services businesses throughout the forty-eight contiguous states and the District of Columbia. (*Id.* ¶ 22.) From 2017 to 2020, Arrive developed the Accelerate transportation management system which it uses to procure reshipping routes, track load volumes, and predict costs and profitability. (*Id.* ¶ 26.) Arrive considers its Accelerate transportation management system and related customer information to be highly confidential. (*Id.* ¶¶ 28-29.) Arrive protects this information by limiting access to offices, utilizing computer passwords, secure file transfers, and personnel instruction and company policy as disseminated through the Employee Handbook on the use of confidential information. (*Id.* ¶ 30.)

Both Plaintiff Arrive and Defendant Traffic Tech have over a hundred entry-level sales employees in order to secure business in

the Chicago area, and hundreds nationwide. (9/23/2021 Tr. 47:16-48:10.) Six former employees are alleged to have violated their Arrive non-compete and non-solicit agreements and are therefore the subject of this opinion and order. The first, Defendant Lindsey Scott, was hired by Arrive on August 21, 2017, shortly after completing her bachelor's degree. (*Id.* ¶ 31; Scott Dep. Tr. 102:6-15, Ex. 8, Sealed Exhibits, Dkt. No. 59-2.) As a condition of her employment, Scott executed an employment agreement with Arrive. (2017 Agreement, Ex. B, Compl., Dkt. No. 1-3.) The 2017 Agreement held, in the relevant section, the following promise:

> 5. [. . .] In recognition of the Company's provision to Employee of the Confidential Information, including trade secrets, which Employee promises not to disclose, and/or any specialized training the Company provides to Employee, as well as the substantial time, expense, and effort the Company has invested in obtaining and maintaining its relationships with its customers and employees, Employee agrees to the non-competition and non-solicitation agreements set forth in this Agreement and acknowledges such covenants are necessary to protect the trade secrets provided to Employee by the Company.

(2017 Agreement § 5.) The 2017 Agreement also included a six month non-compete period and a twelve-month non-solicitation period. (*Id.* §§ 5(a)-(b).) The other Defendants, Matthew J. Duffy, Scott C. Mayer, Frank J. Hernandez, Bryan C. Klepperich, and Jake Hoffman (together, with Lindesy Scott, the "Defendant Employees") were

similarly entry level employees who signed agreements with identical language. (Sec. Am. Compl. ¶¶ 49-51, 62-66, 74-76, 85, 96-99.) The possible exception to the "entry-level" designation was Defendant Duffy, who had slightly more experience from working at Defendant Traffic Tech prior to his position with Plaintiff Arrive. (9/23/2021 Tr. 46:6-13.)

According to the Defendant Employees' testimony, the Defendant Employees began using Arrive's confidential Accelerate software at the beginning of the COVID-19 pandemic in March of 2020. (*See, e.g.,* Scott Dep. Tr. 129:24-130:2.) During this time, Arrive began operating remotely and allowing employee access to Arrive's proprietary software from their personal devices. (Hernandez Dep. Tr. 126:21-22; 158:10-12, Ex. 10, Sealed Exhibits, Dkt. No. 59-4 ("We only had access to Accelerate once COVID hit.") ("To my knowledge it was officially rolled out – it coincided with all of the employees working from home because of COVID."); Scott Dep. Dr. 94:14-16 ("During COVID, I operated off my personal cell phone for all business needs for Arrive Logistics.").)

On December 1, 2020, Arrive circulated a revised Employee Handbook. In it, Arrive updated their "Floating Holiday" policy to the following: "Arrive has chosen to offer one floating holiday in order to provide eligible employees with the flexibility to meet both their work and personal needs. Full-time, regular employees

- 4 -

will be awarded one floating holiday annually on their anniversary date with Arrive to use at their discretion." (2020 Emp. Handbook § 7.02, Ex. 6, Resp., Dkt. No. 65-6.) Arrive's corporate representative suggested that the company's new health and wellness benefit plan, including the additional time off and floating holiday, began in either August of 2020 or January of 2021, but did not commit to an exact time period. (Sandager Dep. Tr. 27:2–29:11, Ex. 7, Sealed Exhibits, Dkt. No. 59-1.)

Starting in December 2020 and through January 2021, Plaintiff Arrive Logistics required Defendant Employees to sign an updated Employee Agreement. The agreement held, in the relevant sections, the following:

> 1.c. <u>Consideration</u>. Employee acknowledges that at-will employment, access to protectable assets and relationships of Company, and participation in Company's revised compensation and benefits programs (including the receipt of an annual floating holiday) are provided in exchange for Employee's agreement to be bound by the obligations stated herein. Employee's at-will employment with Company would not be available and Employee would not gain access to Company's protectable assets and relationships or participate in Company's revised compensation and benefits programs (including the receipt of an annual floating holiday). Employee is not otherwise lawfully entitled to at-will employment or such access or participation and Employee agrees and acknowledges that Employee's at-will employment and Employee's access to Company assets and relationships and ability to participate in the revised compensation and benefits program (including the receipt of an

- 5 -

annual floating holiday) is sufficient consideration for Employee's agreement to be bound by the obligations stated herein.

. . .

5. <u>Non-Compete/Non-Solicitation/Restrictive Covenants</u>. Employee acknowledges, that Company expends significant expense and effort to develop its business as well as secure customers, suppliers, carriers, and vendors, and that such goodwill and relationships are critical business assets of the Company. Employee acknowledges and agrees that information, including the Confidential Information (defined in section [sic] 3), which Employee has acquired, will acquire, or otherwise have access during the course of Employee's employment will enable Employee to irreparably injure the Company Parties if Employee should engage in unfair competition. Employee also acknowledges that Employee's position is one which requires public involvement with Company, its clients, and contacts, thus the position requires loyalty to preserve a positive public image of the Company and prevent injury to the Company by soliciting the Company's employees, contractors and clients for the direct benefit of a competitor. In recognition of the Company's provision to Employee of the Confidential Information, including its trade secrets, which Employee promises not to disclose, and/or any specialized training the Company provides to Employee, as well as the substantial time, expense, and effort the Company has invested in obtaining and maintaining its relationships with its customers and employees, and in conjunction with the consideration set forth in Section 3, Employee agrees to the non-competition and non-solicitation obligations set forth in this Agreement and acknowledges such covenants are necessary to protect the trade secrets provided to Employee by the Company. Therefore, the Employee hereby agrees as follows:

- 6 -

a. <u>Non-Compete</u>. During Employee's employment and for a period of six (6) months following the termination of Employee's employment, Employee shall not directly or indirectly:

i. Engage or participate in <u>the rendering of services which are the same or similar to the services Employee provided over the last two (2) years of employment with the Company in any aspect of the Business in the Territory</u>, which is intended or otherwise competes with Company in any manner or capacity, including by not limited to rendering such services as a principal, member, shareholder, partner, officer, director, employee, advisor, consultant, or agent for a competitor of the Company. For the purposes of this Agreement, the term "<u>Territory</u>" shall mean the contiguous forty-eight states of the United States and the District of Columbia and this definition of Territory is the least expansive definition to protect the Company's interests. To be clear, it is not a breach of this covenant if Employee provides or performs services in a capacity that is not the same as or substantially similar to the responsibilities or services Employee performed or supervised on behalf of Arrive during the twenty-four (24) month period prior to termination of your employment.

b. <u>Non-Solicitation</u>. During Employee's employment and for a period of twelve (12) months following the termination of the Employee's employment, Employee shall not directly or indirectly:

i. induce or solicit any client, carrier, or customer of the Company that Employee directly or indirectly provided services to on behalf of the Company or otherwise came into contact with or had learned Propriety Information as a result of Employee's employment with Company (each a "<u>Company Customer</u>") to patronize or enter into any agreement with any other person or entity

- 7 -

engaged in the Business, including but not
limited to, persuading or inducing any Company
Customer to terminate or fail to renew or
extend said Company Customer's relationship
with Company or any of its affiliates;

ii. service, canvass, solicit or accept
any business or employment from any client,
carrier or Company Customer or its parents,
subsidiaries, or affiliates for the purpose of
providing services in the nature of the
Business or otherwise competing with the
Company;

iii. seek employment with, or otherwise
request or advise any client, Company Customer,
carrier, vendor, or supplier of the Company to
withdraw, curtail or cancel such parties then
current level of business or relationship with
the Company;

iv. in any manner use the Confidential
Information to take advantage of or divert, or
assist any other person to take advantage of
or divert, any business opportunity of, or that
might become available to Company; or

v. employ, or seek to employ, any person
who is then currently employed by or during the
Employee's employment was employed by Company
or otherwise directly or indirectly cause,
induce, or attempt to cause or induce such
employment to terminate such employment.

(*See, e.g.,* Scott Emp. Agreement §§ 1(c), 5, Mem., Ex. 1,
Dkt. No. 56-1.) For Defendant Matthew Duffy, the language was
identical with regards to all terms and conditions, except that he
promised to restrain from competition for twelve months and
restrain from solicitation for eighteen months. (Duffy Emp.
Agreement §§ 1(c), 5, Mem., Ex. 3, Dkt. No. 56-3.) Defendant Scott

signed her agreement on January 15, 2021. (Scott Emp. Agreement § 1.) Defendant Duffy signed his agreement on December 15, 2020. (Duffy Emp. Agreement § 1.) The other Defendant Employees signed sometime between these two dates. (Mayer Emp. Agreement § 1, Mem., Ex. 2, Dkt. No. 56-2; Hernandez Emp. Agreement § 1, Mem., Ex. 4, Dkt. No. 56-4; Klepperich Emp. Agreement § 1, Mem., Ex. 5, Dkt. No. 56-5; Hoffman Emp. Agreement § 1, Mem., Ex. 6, Dkt. No. 56-6.) The updated Employee Agreement also changed the Defendant Employees' commissions benefits program. (Tolari Dep. Tr. 84:10-14, Ex. 1, Exhibit List, Dkt. No. 65-1.) Specifically, "the earnings of the commission" were "lowered by 1 percent." (*Id.* 85:2-3.)

Beginning in March 2021 and continuing into the summer, all of the Defendant Employees ended their employment at Arrive and began employment at Defendant Traffic Tech, Inc. Arrive's separation policy in its 2020 Employee Handbook states, "On the date employment with Arrive ends, the employee will be asked to remove all company data on personal devices under the observation of their supervisor or People Operations." (2020 Emp. Handbook § 3.08.) Despite this policy, at the time of their respective separations Arrive did not ask any of the Defendant Employees if they had confidential information on their personal devices or ask them to return or delete confidential information. During

deposition testimony, most of the Defendant Employees reported having Arrive documents in their possession post-employment.

Defendant Scott reported having five documents in her possession. (Scott. Dep. Tr. 139:24-140:11.) One of these was from 2016 from when she downloaded a document to read at a later time. (*Id.* 140:13-141:3.) The additional four documents were downloaded when Defendant Scott was employed at Traffic Tech and attempting to reset her password on an unrelated account when her Arrive email account "popped up." (*Id.* 141:4-10.) Defendant Scott stated that she downloaded four documents related to her prior job at that time, and then, realizing that it was inappropriate, reported it to her superiors and has not "looked at them or touched them at all" since she downloaded them. (*Id.* 141:11-23.)

Defendant Hernandez reported having three documents in his possession. (Hernandez Dep. Tr. 96:8-18, Ex. 10, Sealed Exhibits, Dkt. No. 59-4.) Hernandez stated that he forwarded himself two documents with his login credentials in order to transfer his 401(k) benefits and access his last paycheck. (*Id.* 97:2-98:4.) Hernandez also forwarded himself a document that listed employee awards, including one given to Hernandez from his fellow employees. (*Id.* 99:13-101:3.)

Defendant Hoffman reported having "all different types of documents" in his possession from Arrive. (Hoffman Dep. Tr. 44:17-

20, Ex. 11, Sealed Exhibits, Dkt. No. 59-5.) Hoffman stated that the documents were, "anything to do with my day-to-day [because] I was working off a personal laptop since March of 2020, and I've got maybe like a surplus of documents in my download history I did not realize had been there." (*Id.* 45:1-5.) Hernandez stated he has not looked at these documents since starting his position at Traffic Tech. (*Id.* 45:6-9.) Hernandez also reports taking a screen shot of the "month-to-month team growth that [he] was directly managing" in order to speak about his accomplishments when applying to future employment, but the screenshot had no identifying information of customers names or specific load volumes. (*Id.* 71:10-19.)

Defendant Klepperich also reported that he still has materials from working at Arrive. When asked about specifics, Klepperich reported, "I couldn't possibly list everything. My phone was connected to my Arrive e-mail, so essentially most phones these days, any e-mail you get that shows up in your phone it remembers the contact information." (Klepperich Dep. Tr. 71:12-72:10.) Klepperich stated he was unsure what other information he had, stating, "To be honest, I haven't checked. I don't know what I do and don't have access to at this point." (*Id.* 72:15-20.) No other documents were reported.

Arrive has identified 72 customers that were serviced by Defendant Employees at Arrive. (9/23/2021 Tr. 26:11–13.) So far, Defendant Scott has had contact with eight of these clients, Defendant Mayer has had contact with eleven of these clients, Defendant Hernandez has had contact with one of these clients, and Defendant Klepperich has had contact with six of these clients. (*See* Mem. at 10–11, Dkt. No. 56 (collecting testimony).) Defendant Duffy has submitted proposal requests related to three of these clients. (*Id.*) Of these contacts, thirteen have done business with Traffic Tech through Defendant Employees. (9/23/2021 Tr. 26:14–18.) Two of these customers were close personal friends with one of the Defendant Employees, and thus started using Arrive's logistics services because of the Defendant Employee and stopped when the Defendant Employee left the company. (9/23/2021 Tr. 29:17–24.) All other customers are still doing business with Arrive. (*Id.*)

On June 9, 2021, Plaintiff Arrive filed a Complaint in the Western District of Texas. (Dkt. No. 1.) As set forth in the Second Amended Complaint, Arrive alleges six counts: (1) breach of contract against the Defendant Employees; (2) violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836–39, against all Defendants; (3) violations of the Texas Uniform Trade Secrets Act against all Defendants; (4) tortious interference with current and

prospective customers and business relations against all Defendants; (5) tortious interference with contract against Defendant Traffic Tech; and (6) unjust enrichment against Traffic Tech. (Dkt. No. 45.) Arrive filed a motion for a Temporary Restraining Order and a preliminary injunction against Traffic Tech on the same day it filed its complaint (Dkt. No. 3.)

On June 11, 2021, the Honorable Judge Robert Pitman denied the Motion for a Temporary Restraining Order and ordered the parties to engage in expedited discovery. On June 16, 2021, Defendants filed a Motion to Dismiss, or, in the Alternative, Transfer Venue. (Dkt. No. 19.) On July 8, 2021, the district court denied the Motion to Dismiss and granted the Motion to Transfer to the Northern District of Illinois where the case was assigned to this Court. (Dkt. No. 27.) The parties engaged in expedited discovery and then argued the remaining Motion for a Preliminary Injunction on September 23, 2021. (Dkt. No. 70.) Because the Arrive employee contract contains an arbitration clause, (*see, e.g.,* Scott Emp. Agreement § 3(e)), the only jurisdiction this Court has over the Defendant Employees is as to appropriate injunctive relief. The Court now decides the Motion.

## II.  **LEGAL STANDARD**

To determine whether a preliminary injunction is warranted, the party seeking the injunction must demonstrate: (1) it has a

reasonable likelihood of success on the merits of the lawsuit; (2) no adequate remedy of law exists; (3) it will suffer irreparable harm if the preliminary injunction is denied; (4) the irreparable harm without the injunction is greater than the harm suffered if the injunction is granted, and (5) the injunction will not harm the public interest. *Kiel v. City of Kenosha*, 236 F.3d 814, 816 (7th Cir. 2000). A court must weigh all these factors as a "chancellor in equity" when deciding to grant the injunction. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir.1992)). In other words, a court uses the sliding scale approach. The more likely that the movant will succeed on the merits, the less the balance of irreparable harms needs to favor the movant's position. *Id.* The Seventh Circuit describes this process as "subjective and intuitive," allowing district courts to "weigh the competing considerations and mold appropriate relief." *Id.* at 896. The movant bears the burden of proof in demonstrating that the injunction is warranted. *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017).

### III.  CHOICE OF LAW

The parties first dispute whether Texas or Illinois law applies to the state contract claims in this suit. In federal court, choice-of-law of law rules for state claims are taken from

- 14 -

the state in which it sits. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020). In this case, the Plaintiff originally filed its suit in Texas. The forum-selection clause in the disputed contracts holds that disputes will be resolved by arbitration, which "shall take place in either Austin, Texas or Chicago, Illinois." (*See* Scott Emp. Agreement § 3(e).) The district court in the Western District of Texas held that, because the clause provided for multiple venues, it constituted a permissive forum-selection clause. (Order at 6, Dkt. No. 27.) Under Fifth Circuit precedent, permissive forum-selection clauses waive personal jurisdiction, and the district court held it had jurisdiction over the Defendant Employees and Traffic Tech. (*Id.* (citing *Weber v. PACT XXP Techs.*, 811 F.3d 758, 768 (5th Cir. 2016)).) That court then elected to transfer the case to Illinois under 28 U.S.C. § 1404(a).

A transfer under Section 1404(a) is done for the convenience of the parties, not due to lack of jurisdiction or for any change in procedural or substantive law. Therefore "the transferee court must follow the choice-of-law rules that prevailed in the transferor court." *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990). The Court applies Texas choice of law rules. Texas law, in turn, gives effect to the choice of law clauses in a contract. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th

Cir.), *opinion modified on denial of reh'g,* 355 F.3d 356 (5th Cir. 2003) (citing *In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 549 (Tex.2002)). The disputed contracts each state that "the validity, interpretation and legal effect of this Agreement shall be governed by the State of Texas." (*See*, *e.g.,* Scott Emp. Agreement § 9(c).) The Court applies Texas law.

## IV. DISCUSSION

### A. Success on the Merits

Arrive requests injunctive relief under two of its counts. First, Arrive asks the Court to enforce the non-compete, customer non-solicit, and employee non-solicit provisions of the December 2020 and January 2021 updated Employee contracts under Count I, Breach of Contract. Second, Arrive asks the Court to provide injunctive relief under Count II for violations of the Defend Trade Secrets Act. The Court addresses each below.

#### 1. *Count I*

Beyond the present Motion for a Preliminary Injunction, the disputes between the Defendant Employees and Arrive will be arbitrated, and the Court is mindful that the ultimate determination on the merits lies with the arbitrator. Some facts, however, have been established from the expedited discovery. First, the Defendant Employees all signed non-compete and non-solicit agreements upon initial employment. For reasons not on the

- 16 -

record, Arrive has not attempted to enforce those earlier non-compete and non-solicit provisions. Instead, Arrive relies upon the agreements executed at various dates in December 2020 and January 2021 that prohibit the Defendant Employees from soliciting Arrive customers and Arrive employees, and rendering services similar to those rendered at Arrive. Arrive then points to testimony that Defendant Employees has violated these provisions while working at Traffic Tech as proof of probable success on the merits.

Restrictive covenants are governed under the Texas Business and Commerce Code Section 15.50(a), which states:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code Ann. § 15.50(a). The Supreme Court of Texas has held that "a unilateral contract formed when the employer performs a promise that was illusory when made can satisfy the requirements of the Act." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). Even still, "[t]he covenant cannot be a stand-alone promise from the employee lacking any new consideration from the employer." *Id.*

- 17 -

In this case, Arrive required Defendant Employees to sign the revised contract after being hired under their original contract. The Texas Supreme Court cautioned that "the Legislature and the courts would not allow an employer to spring a non-compete covenant on an existing employee and enforce such a covenant absent new consideration from the employer." *Id.* Arrive does not dispute that most of its recited consideration were already promised and accepted by the Defendant Employees prior to the contract Arrive now wishes to enforce. The contract names three specific categories of consideration to bind the Employees to the updated contract: "at-will employment, access to protectable assets and relationships of Company, and participation in Company's revised compensation and benefits programs (including the receipt of an annual floating holiday)." (*See, e.g.,* Scott Emp. Agreement § 1(c).)

The Court first considers at-will employment. The Texas Supreme Court has held that at-will employment, alone, cannot be an "otherwise enforceable agreement" under Section 15.50(a). *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 584 (5th Cir. 2015). To hold otherwise would prevent the employment from being "at-will" by either party. *Id.* As such, the Court does not consider it to be sufficient consideration for the revised contract.

Second, the Court considers the Company's revised benefits program. During the expedited discovery, it was discovered that Arrive's compensation program decreased the benefits provided to Defendant Employees. In order to be enforceable, consideration must be "a present exchange bargained for in return for a promise and consists of benefits and detriments to the contracting party." *TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*, 570 S.W.3d 749, 760 (Tex. App. 2018). Specifically, "detriments must induce the parties to make the promises, and the promises must induce the parties to incur the detriments." *Id.* Both the revision of compensation downwards as well as the non-solicit and non-compete provisions are detriments to the employee, and thus one cannot act as consideration for the other. The Court notes that the health benefits, paid time off policy, and floating holiday mentioned in the contract were initiated through the 2020 Employee Handbook, which was provided prior to the updated contract. When questioned, Arrive's corporate representative was unable to state whether these benefits were related to the signing of the contract or had been implemented months earlier. As such, there is insufficient evidence in the record for the Court to consider these benefit revisions to be adequate consideration.

Finally, Arrive promised "access" to the Company's confidential information. The program containing the confidential

information and the source of the "access," the Accelerate program, has been used by the employees since March of 2020, nine months before the contract was circulated by Arrive. Similar to the floating holiday, it appears that the access to Accelerate is unrelated to the promises made by the Defendant Employees in the revised contract.

The strongest argument made by Arrive, and the one most in contention between the parties, is the claim that Arrive provided new or additional access to confidential information conditioned on the signing the non-compete agreement. At Arrive's first corporate representative deposition, the representative stated that no new access was provided as specified in Section 1(c) of the updated contract. That deposition was terminated inopportunely, and a second representative provided somewhat conflicting testimony. (*See* 8/25/2021 Letter, Dkt. No. 52.) That second representative claimed that Arrive regularly updates the Accelerate software and provides new features which, in sum, would constitute new access. Arrive's representative, however, was unable to provide specifics as to what, if anything, was updated as consideration in return for Defendant Employees' promises. The Court also notes that the Defendant Employees signed the contract at various dates over a two-month period. Arrive has not provided any information as to whether the access changed upon signing the

agreement for the different Defendant Employees. Without more specifics, however, the Court cannot say with certainty that additional access was provided by Arrive conditioned on the receipt of the revised contract agreements.

The Court notes that, under Texas law, an employer requiring a non-compete or non-solicit can promise implicitly to provide confidential information as consideration. *See, e.g., Realogy Holdings Corp. v. Jongebloed,* 957 F.3d 523, 535 (5th Cir. 2020) (affirming a district court who found that the employer implicitly promised to provide confidential information in return for the non-compete provision). Neither Arrive nor Traffic Tech introduced the theory of implicit promises at argument, and the Court is hesitant to apply it here. Although this would be normally a straightforward analysis under Texas law, there are two reasons to be cautious. First, the provision of Confidential Information was used explicitly in Arrive's first contract with Defendant Employees. As a result, Arrive was aware of that it could rely on the provision of confidential information as consideration and decided to remove it from the revised contract. Second, because Arrive listed out other specific considerations in its contract, the Court thinks it is unwise to add implicit consideration to that list without further explanation from Arrive as to why the company the provision of Confidential Information was omitted.

Given this initial obstacle, the Court does not address the substance of the contract violations, including the proper scope of the contract provisions and the relative similarity of job positions. The Court finds that the non-solicit and non-compete provisions in the contract are likely unenforceable due to the lack of consideration on the part of the employer, and that Arrive has a low likelihood of success on the merits of the breach of contract count with the current record.

### 2. Count II

Arrive also requests a preliminary injunction under the Defend Trade Secrets Act, codified at 18 U.S.C. §§ 1836–39. A trade secret may be all types of "financial, business, scientific, technical, economic, or engineering information." 18 U.S.C. § 1839(3). The existence of a trade secret is one of fact, which requires "an ad hoc evaluation of all the surrounding circumstances." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003). Information is considered a "trade secret" when (1) the owner has taken "reasonable measures" to keep information confidential, and (2) the information provides "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Life Spine, Inc. v.*

- 22 -

*Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021) (quoting 18 U.S.C. § 1839(3)).

Arrive lists the following information as trade secrets: (1) "the methods, plans and processes," (2) customer contracts and preferences, (3) customer contact names and details, (4) customer buying trends, (5) customer load volumes and routes, (6) customer pricing and costs, (7) "specific customer particularities." (Mem. at 14, citing Tim. Tolari Decl. ¶¶ 9-10.) Traffic Tech objects that these categories are insufficiently definite. Both parties cite to the same case, *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115 (N.D. Ill. 2019), in support of their arguments. In *Vendavo*, the district court first noted that "where a plaintiff suggests that general categories of information are trade secrets, the lack of specificity greatly reduces its chances of demonstrating that a defendant has misappropriated its trade secrets." *Id.* at 1130 (collecting cases). The district court then concluded that the plaintiff had shown "that the customer-specific information in the first category—in particular a customer's 'pain points' and the specific solutions developed to address those 'pain points'—[were] trade secrets." *Vendavo*, 397 F. Supp. 3d. at 1131. The district court noted that plaintiffs in *Vendavo* had shown their specific efforts to "identify and solve pricing issues of which their client

may not even be aware," shorthanded as "pain points," through "interviews and other conversations" with the client. *Id.* at 1132.

As set forth in its memorandum in support and its reply brief, Arrive's categories lack the level of detail present in *Vendavo*. In support of its claim, Arrive simply states, "[t]here is no dispute this *type* of information is confidential." (Mem. at 14(emphasis added).) The Court agrees that, for example, "methods, plans, and processes" or "specific customer particularities" are the *type* of information that is confidential, but the lack of detail provided by Arrive makes it difficult for the Court to determine whether the information has independent economic value in being kept secret, as is required under the Defend Trade Secrets Act.

In order for information to be protected by law, a company also must take reasonable efforts to protect its information. Arrive points to its routine policies, which include confidentiality policies, confidentiality covenants in the Employment Agreements, computer passwords, secure file transfer protocols, and limiting access to offices. (Tim Tolari Decl. ¶¶ 9-10.) While limiting access to offices may have been a threshold of reasonable means of security when employees kept their work at the office, the Defendant Employees all worked from home offices for over a year prior to their separation from Arrive. In addition,

the Defendant Employees were instructed to work from their personal devices while remote. Consequently, the Defendant Employee testified that they had information on their personal devices and at their homes during the course of their employment. None were asked to delete or otherwise return the information in their personal devices upon separation with Arrive. Further, Arrive failed to disable the email of at least one Defendant Employee, and as a result she continued to receive emails on her personal device even after starting at Traffic Tech.

In response, Arrive points to contract language which binds Defendant Employees to not use the confidential information post-separation. The Court notes that all Defendant Employees have stated in their depositions that they have not used the any information from Arrive while at Traffic Tech. The Court understands that Arrive might have some reason to be concerned despite this testimony. The ultimate problem, however, comes not from Defendant Employees but from Arrive's actions in contravention of its own policy. Because Arrive did not provide its own devices for employees to work from home, Defendant Employees were required to use their own devices to Arrive's benefit. Arrive then failed to ask any questions about the information remaining on Defendant Employees' personal devices and did not terminate access to Arrive's work email system. These

failures are the responsibility of Arrive as part of its reasonable measures to secure its confidential information. For these reasons, the Court finds there to be a low probability that there are trade secrets, first because of the undeveloped record as to what the secrets are, and second because of the inconsistent record on Arrive's ability to keep reasonable care of its information.

### a. Inadequate Remedy and Irreparable Harm

In order to receive a preliminary injunction, Arrive must show "that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the injunction is not issued." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). This is a "threshold requirement." *Id.*

Whether or not there is a remedy at law depends, in part, in the type of injury. If the plaintiff can be made whole by prevailing on the merits and awarded damages, then the plaintiff will not be harmed by the extended timeline inherent in the judicial process. If, however, a final injunction or damages would be insufficient to recoup fully plaintiff's costs, there exists irreparable harm. *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013).

Arrive argues that it will face the continued threat of lost sales and opportunities unless Defendants are enjoined. Arrive also argues that it is impossible to ascertain with accuracy the

extent of any loss which weighs in favor of the Court granting the preliminary injunction. Arrive also mentions in its briefing that goodwill is central to its business but does not describe to what extent its goodwill was impacted by the Defendant Employees' alleged conduct.

"While the difficulty in calculating future profits can often justify the finding of an irreparable injury with no adequate remedy at law, there is no *per se* rule that claims of lost profits are invariably incalculable." *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986) (cleaned up). Arrive has filed a declaration stating that it would be unable to calculate lost sales without a preliminary injunction. Traffic Tech, however, points that there are a set number of customers that were serviced by the six Defendant Employees while at Arrive. As a result, the Court is fully capable of determining how many of these customers were affected by the transition of the Defendant Employees. Of the overlapping customers, thirteen have had contact with Defendant Employees and provided business to Traffic Tech. Two of these customers have stopped doing business with Arrive completely, and eleven do business with both Arrive and Traffic Tech.

The Court considers the two customers who are close personal friends of one of the Defendant Employees and have followed that Defendant Employee to Traffic Tech. Arrive does not dispute that

the transference of these two business to Traffic Tech was unrelated to Arrive's Confidential Information and due to a pre-existing relationship between the Defendant Employee and the customers. Further, the two businesses, now identified, have fully calculable injuries as to loss of income.

The other eleven overlapping customers were already present in Traffic Tech's business systems prior to Defendant Employees switch to Traffic Tech. As a result, Traffic Tech argues that, given current technology and the excellent record-keeping of both businesses, it would be a straightforward process to calculate whether sales volumes of any of the eleven businesses moved from Arrive and to Traffic Tech. As a result, these actual loss sales are also calculable. Arrive does not dispute its tracking software capabilities, and thus the Court finds the losses to be calculable.

Arrive also argues that, absent a preliminary injunction, it would suffer from lost opportunities. However, Arrive does not expound on what opportunities are lost when entry-level sales and pricing representatives, six out of hundreds of similarly situated employees, switch companies. Similarly, Arrive mentions goodwill without presenting any arguments as to how its goodwill would be affected by the turnover of entry-level employees. The Court finds that Arrive has not shown sufficient evidence that there is an incalculable harm.

### b.   Balance of Harms

The Court next weighs the harm to Arrive if the injunction was denied against the harm that to Defendants if the injunction was granted. *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). In this case, Arrive's harm appears to be potential financial loss from the thirteen accounts. At this point, the Defendant Employees have been working at Traffic Tech for almost the entire length of the non-compete time period. This is not Arrive's fault. Arrive was entitled to file its initial suit in Texas, and the transition, as well as the discovery necessary to file the preliminary injunction motion, took time. Nevertheless, the Court is cognizant that any damages have likely already occurred.

If the injunction was granted, the Court finds that Defendant Traffic Tech, by suffering the loss of six employees out of hundreds, would be mildly inconvenienced. On the other hand, Defendant Employees would be out of work for six months to a year, as the non-compete and non-solicit clocks start from the point of enforcement. According to Traffic Tech, the job positions are similar enough that at least four and possibly all six employees would be unable to work at Traffic Tech for the entire length of the non-compete and non-solicit period. (9/23/2021 Tr. 43:19-44:15.) Defendant Employees, then, would be heavily harmed by enforcement of these provisions by having to stop working at their

new employment. The Court finds, on the whole, the balance of hardships would weigh heaviest on the Defendant Employees in this matter, particularly as there is a low likelihood of success on the merits.

### c. Public Interest

In addition to the prior analysis, the "injunction must be in the public interest." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020), *cert. denied,* 141 S.Ct. 1754, 209 L. Ed. 2d 515 (2021). In this case, the affected nonparties are primarily the customers of both Defendant Traffic Tech and Plaintiff Arrive. In part because there is insufficient evidence that trade secrets were acquired or that confidential information was used, the Court finds there would be very little effect on nonparties if an injunction would be issued.

### IV. **CONCLUSION**

For the reasons stated herein, Plaintiff DM Trans, LLC's Motion for a Preliminary Injunction (Dkt. No. 56) is denied. **IT IS SO ORDERED.**

_____
    Harry D. Leinenweber, Judge
    United States District Court

Dated: 10/26/2021

- 30 -